

FILED
Nov 15 2019, 9:18 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Max A. Myers
Myers Law Office
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE
NINA FORTUNKA

John O. Feighner
Troy C. Kiefer
Haller & Colvin, P.C.
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE
STAR FINANCIAL BANK

Matthew J. Elliott
Beckman Lawson, LLP
Fort Wayne, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Living Trust Agreement of Virgil C. Morningstar and Agnes M. Morningstar,<br><br>Teresa J. Morningstar,<br>*Appellant*,<br><br>v.<br><br>Nina Fortunka and STAR Financial Bank,<br>*Appellees*. | November 15, 2019<br><br>Court of Appeals Case No.<br>18A-TR-3044<br><br>Appeal from the Allen Superior Court, Probate Division<br><br>The Honorable Stanley A. Levine, Judge<br><br>Trial Court Cause No.<br>02D03-1604-TR-8 |

**Brown, Judge.**

Teresa J. Morningstar ("Morningstar") appeals the trial court's November 21, 2018 order finding that she breached various duties as trustee of the Living Trust Agreement of Virgil C. Morningstar and Agnes M. Morningstar (the "Trust"). The trial court entered judgment in favor of the trust beneficiaries and awarded attorney fees in favor of beneficiary Nina Fortunka. The restated issue is whether the court erred in finding that Morningstar breached her duties as trustee. We affirm.

## Facts and Procedural History

In January 2012, Agnes died, predeceasing Virgil. Prior to her death, Attorney Max Myers prepared the Trust, which established Agnes and Virgil as trustors and Agnes, Virgil, and Morningstar as trustees.[1] Morningstar, a beneficiary of the Trust, signed the trust instrument as an attorney-in-fact on behalf of Agnes and Virgil as both Trustor and Trustee and as herself as Trustee. The Trust provides in part that, in the investment, administration and distribution of the trusts created under it, the trustee shall be given "those powers set forth in the Indiana Trust Code as amended from time to time hereafter" and, in Article X, titled "Compensation of Trustee," that the trustee shall receive reasonable compensation for ordinary services and "shall also receive reasonable compensation for unusual and extraordinary services rendered in serving the personal needs of the Trustor [sic] and in settling Trustor's [sic] financial affairs

---

[1] As Morningstar points out, the Trust appears to contain a scrivener's error when it states that it was executed on the 7th day of "January, 2011." Appellant's Appendix Volume II at 35.

and in making distribution of the assets." Appellant's Appendix Volume II at 37, 41. Article X further provided that "[s]uch compensation shall be adequate to cover the work involved, as well as responsibilities assumed, in effecting financial disposition of the trust." *Id.* At some point, Agnes and/or Virgil transferred title to certain real estate to the Trust.

[3] Virgil died in August 2015 and, in administering the Trust, Morningstar completed an accounting for the period covering August 13, 2015, through May 31, 2016, and submitted it to the trial court on July 19, 2016. The accounting lists as an Asset an item titled "Rental Real Estate" valued at $226,000.00, and as Income to the "CHASE BANK Account" a "Sale of rental real estate" transaction on "1/15/16" valued at $210,342.63 and bearing an asterisk notation which states "reduction in amount reflects costs of sale." Appellant's Appendix Volume II at 45, 47. The accounting also contains an affidavit in lieu of receipts, checks, and vouchers that lists a disbursement on "1/20/16" of $6,780.00 for "Teri Morningstar – RE finders fee" by means of "ck 4516," as well as monthly or bimonthly disbursements of $845.50 for "Teri Morningstar – payroll" from "8/17/15" until "3/1/16."[2] *Id.* at 49-52.

[4] On September 9, 2016, Fortunka as one of twenty-one beneficiaries of the Trust filed her Objections to Trustee's Court Ordered Accounting, which asserted that

---

[2] The affidavit does not list monthly disbursements other than "9/16/15" for September 2015 and "1/19/16" for January 2016. Appellant's Appendix Volume II at 50-51. The affidavit also contains a disbursement on August 25, 2015, of $600.00 for "Teri Morningstar – finders fee" by means of "ck 4454." *Id.* at 49.

the Trustee breached her fiduciary duties, committed self-dealing, and carelessly and negligently handled trust assets. It stated that among the undervalued assets were fourteen rental properties, which were sold in a single sale without appraisals performed either at the time of Virgil's death or at the time of the sale, and that the sale was heavily discounted. It further contended that Morningstar continued to receive a salary and mileage as property manager after the sale, and it objected to several disbursements as unclear and invalid expenditures of the Trust, including those "described as finder's fees, payroll, mileage and misc. paid to Trustee." *Id.* at 57.

[5] On July 17, 2018, and September 4, 2018, the court held hearings. Tom Mack testified as to his credentials as an independent real estate appraiser, and the court found him to be qualified as an expert in the field of appraisals without objection. He indicated that he completed exterior appraisals for 2822 Mauldin Drive, 2724 Schaper Drive, 2315 Saint Mary's Avenue, and 2221 Vance Avenue, explained his methodology, and provided an assessed retrospective value for each of the properties effective January 15, 2016.[3] During cross-examination, he provided an opinion that he had "known parties to

---

[3] The court admitted without objection four appraisal reports for real property that had the purpose of "estimat[ing] the market value of the property . . . as improved, in unencumbered fee simple title of ownership." *Accord* Exhibits Volume I at 7. The reports' Opinion of Value was $11,000 for the property at 2822 Mauldin Dr, $34,000 for the property at 2724 Schaper Dr, $23,000 for the property at 2315 Saint Marys Ave, and $30,000 for the property at 2221 Vance Ave. Each report contained signed pages titled Exterior-Only Inspection Residential Report, Property Record Information per Wayne Township Assessor, and Comparable Sales.

inaccurately fill out sales disclosures" through his work as an assessor back in 2000, where he would "see sales disclosures that did not reflect the sales price." Transcript Volume II at 46.[4]

[6] The court admitted various Objector's Exhibits, including copies of correspondence regarding the administration of the Trust and the sale of the properties. A letter by Attorney Myers, addressed to the heirs of Virgil, dated August 26, 2015, and admitted as Objector's Exhibit 5, announced that Virgil had died on August 13th and stated:

> Upon the death of Agnes [] all of the business real estate which she owned was placed into a living trust for which Virgil and [Morningstar] were the Trustees. Those properties have been managed, improved and a sale off at [sic] fair value has been underway. However, there remains [sic] approximately one dozen houses unsold in addition to eight (8) that are under Contracts which will pay off at various dates over the next three (3) years. I will be asking for input from you in the future regarding suggestions for distribution of the Contract payments and/or the remaining real estate.
>
> I will happily discuss the strategy and results involved in the business real estate since Agnes died, however, I can state up front that the plan was to have it all sold at a good price before Virgil died.

* * * * *

---

[4] We cite the page numbers as they appear consecutively in the PDF of the Electronic Record. *See* Ind. Appellate Rule 28(A) (The electronic Transcript is to be prepared in accordance with Appendix A, which provides in part: "Each volume of the Transcript shall be independently and consecutively numbered at the bottom. Each volume shall begin with numeral one on its front page.").

By virtue of the Estate holding a good deal of real estate, it will be necessary for us to come to a consensus of how that is to be handled before a complete distribution from the Estate can be made.

I will secure a complete status on all of the real estate and submit it to the heirs for comment on how they would prefer it be handled. Look for that in another ten (10) days or so.

Exhibits Volume I at 101-102. A letter by Attorney Myers, similarly addressed, dated September 15, 2015, and admitted as Objector's Exhibit 6, stated that it appeared that the one asset which would pass through the estate was Virgil's brokerage account valued at $826,215.08. The letter also stated:

As previously mentioned, there exists [sic] in the trust approximately one dozen houses unsold in addition to eight (8) that are under Contracts which will pay off at various dates over the next three (3) years. The market is such in Fort Wayne that the only realistic expectation is that the houses must be sold to an investor who will keep them as rentals. The mortgage companies will not lend on a property worth what these are worth and further, the buyer intending to live in one will not have the down payment required to entice a lender.

* * * * *

I have already been asked by more than one heir what I think the shares are expected to be. I refuse to commit to an exact number because the selling price of the real estate is so elusive that I can only speculate.

If these dozen houses average in value around $12,000.00* and the balance on the contracts adds another $25,000.00, we can expect the real estate to add another $160,000.00 to the distributive amount for a total approaching $990,000.00. This amount is

subject both to the marketability of the real estate and any fluctuation in the value of the brokerage account.

* * * * *

* They are mostly 1,000 sq. ft. rental properties in the bad parts of Fort Wayne.

*Id.* at 103-104. Fortunka responded affirmatively when asked whether the September 15, 2015 letter was the first time she had received the information that the only realistic expectation was to sell the properties to an investor.

[7] A letter by Attorney Myers, addressed to the Trust beneficiaries, dated October 30, 2015, and admitted as Objector's Exhibit 7, indicated that he had held a meeting to address questions by Kyle Foreman and others.[5] It further stated:

> Let me start by saying that I was truly dumbstruck by the amount of false information that is circulating among some of you. Some of the rumors which Kyle related as having been suggested by some of you are not just a little wrong; they are nowhere close to any conceivable possibility of misunderstanding. They are outright fabrications with no basis in fact whatsoever.
>
> I do not intend to waste my time and your money (for attorney fee bills) chasing these wild stories to ground. If any of you have a specific question, ask it of me. If it is a relevant inquiry, you will receive a prompt and complete answer. If I am asked a question that has no role in moving the estate/trust to closure and distribution, I will not waste trust assets looking into it.

---

[5] Fortunka testified that Foreman was her brother and that he lived in south Florida as of October 2015. Transcript Volume II at 64. Plaintiff's Exhibit 34, which lists the names and addresses of the beneficiaries of the Trust, indicates that Foreman was a beneficiary as of September 2017. Exhibits Volume II at 22.

* * * * *

In about 45 days from the date of this letter, the Estate can be closed and the funds transferred to the Trust. The Trust was originally constructed to run Agnes' real estate business so it has only a modest amount of liquidity – with the bulk of the assets being real estate[.]

* * * * *

[] The remaining assets in the Trust will be the real estate which appears on a list enclosed herewith.[6] Note that the top items are under contract, some of which will last almost three (3) more years. There is little that can be done with these except let them pay out and periodically distribute the accumulated payments to you beneficiaries.

The second set is the rental houses which can be sold at any time for a reasonable fair value, if a buyer can be located. Kyle was visibly shocked when I informed him that several of these houses were valued in the $8,000.00 to $12,000.00 range. I proved it to him by showing him sales documents for properties in these neighborhoods which have sold in the last three months for this price range.

**THIS JUST IN**: [Morningstar] has just informed me that an individual has indicated a willingness to purchase all of these houses and will give us a written offer with his price early next week.

---

[6] Attached to the October 30, 2015 letter was a document titled "V & A Morningstar Trust Properties," which listed eight Fort Wayne addresses as "Currently Being Sold On Contract," including "5226 Winter Street," and the following Fort Wayne addresses as "Rentals": "2822 Mauldin Drive," "2724 Schaper Drive," "2315 Saint Marys Avenue," "2221 Vance Avenue," "5714 Holiday Lane," "2602 Lynn Avenue," "4115 Robinwood," "4809 Spatz Avenue," "4310 Standish Drive," "2620 Trentman Avenue," "436 Violet Court," "3724 Winter Street," and "1302 Sinclair Street." Exhibits Volume I at 108.

Once received, I will share it with you on the following basis: A) If you have a valid objection to the price or terms, that objection must be sent to me in writing, within 10 days, detailing the objection with documented or statistical support; or B) that you submit a valid written offer to purchase the lot of the properties (either by you or someone else as buyer) for a greater price and terms as good as the offer given to [Morningstar].

If the offer we receive next week is of reasonable value and we have not received any qualifying response (as set forth in the preceding paragraph) then said offer will be accepted.

* * * * *

Please take this letter as my request to each of you to propose a solid alternative to the options which I have outlined above. Some that come to my mind that you may consider are:

a. Sell all to a company/person engaged in the rental of low value housing;

b. Have [Morningstar] continue to market each unit seeking a cash buyer for them; or

c. One or more of the beneficiaries come up with the money to buy them or agree to take them as a distribution rather than cash[.]

Please don't perpetuate the misunderstanding that Kyle was operating upon: We cannot put a sign in the front yard of most of these places and then drive over with the key for a showing. Most likely a call to see it is the precursor to an armed robbery. Furthermore, you do not go into these neighborhoods after 4:00 pm for any reason, without a police escort.

*Id.* at 105-106. Fortunka testified that she understood the statement in paragraph c. of the letter to mean that if she or any of the other beneficiaries "wanted to buy them we could exchange our shares of cash for the properties."

Transcript Volume II at 68. She also testified that, in reliance upon the letter, she then began "[t]o purchase the properties" and "sent a letter to [Attorney Myers] and [Morningstar] saying that [she] would like to take the properties in lieu of cash and that [she] had other beneficiaries that would also trade their cash distributions for property." *Id.* at 69.

[8] A letter by Attorney Myers, addressed to the beneficiaries of the Trust, dated November 10, 2015, and admitted as Objector's Exhibit 8, indicated that the offer mentioned in the previous letter had arrived and stated: "[i]n the interest of saving a few trees, I can tell you that the offer is for $220,000.00 to purchase those properties shown on page 6 of the offer (a copy of which page I have attached),"[7] and that, "[a]s the Trustee, [Morningstar] is inclined to accept this offer, however yields to any honest concerns that the beneficiaries may have." Exhibits Volume I at 109. It stated:

> So, as indicated in my letter of October 30th: A) if you have a valid objection to the price, that objection must be sent to me in writing and be in my hands no later than November 25, 2015; or B) You or a conglomerate must submit a valid written offer to purchase all of those properties shown on the enclosed page for a greater net cash price than the offer just given to [Morningstar] by that November 25th date.

---

[7] Following Attorney Myers's November 10, 2015 letter, the Exhibits Volume contains a photocopy of a single page of what appears to be a form document with largely-indecipherable handwriting under the header "Further Conditions." Exhibits Volume I at 110. The numbers "1302," 2602," and "2822" can be deciphered. *See id.*

*Id.*

[9] A letter by Fortunka addressed to Morningstar, dated November 18, 2015, and admitted as Objector's Exhibit 9, responded to Attorney Myers's November 10, 2015 letter; disagreed with "selling the 14 properties for $220,000" which, as it indicated, "appear to be liquidated at too far below fair market value"; and provided examples of what Fortunka deemed to be appropriate average prices for specific units. *Id.* at 111. It stated that she expressed a preference for selling the properties individually as the "letter from [Attorney Myers] dated October 30, 2015 [had] proposed." *Id.* With regard to the "option for Trust Beneficiaries to receive distribution as a combination for property and cash," it indicated that Fortunka was in the process of contacting all Trust beneficiaries, several of whom had expressed a desire to take that option, and stated: "As a group we offer $225,000 for the 14 properties in question. We consider this a great opportunity for [the Trust] to minimize costs and for the Beneficiaries to receive better values." *Id.* The letter requested that Morningstar provide relevant property information and inquired into the properties under contract. When asked about the letter, Fortunka testified that she considered $225,000 to be her offer and that she did not receive the rent amounts, occupancy details, property conditions, or known defects from the trustee or Attorney Myers.

[10] Attorney Myers's response to Fortunka, dated November 24, 2016, and admitted as Objector's Exhibit 10, indicated he had discussed her letter with Morningstar and stated:

> Clearly, your simple mention of the willingness of a group of heirs to purchase the properties falls short of a real offer and cannot be treated as such. But, it does raise the specter that failing to allow a validly formulated offer to be prepared would be to neglect the interests of all beneficiaries.

*Id.* at 112. The letter stated that Fortunka's suggestion – of selling the properties individually resulting in a larger sale price – was "accurate as stated," however the process "could easily take six months to a year," during which "time the costs to manage and maintain the properties would likely eat up more than the extra funds from an individual sale." *Id.* The letter stated that a realtor handling the sales would result in "an immediate six percent loss of sale price due to commission" and provided that, accordingly, the Trustee

> will entertain the "best and final" offer of any and all interested purchasers, subject to the criteria set forth below. The best offer received by the date set forth below which meets all of the stated criteria will be accepted by the Trust as the final purchaser.

> The criteria for the offer to be considered are as follows:

> 1. The cash price must be stated and must be for all of the real estate titled to the Trust;

> 2. The purchase must be "AS IS" meaning no warranty as to representations regarding physical condition, tenancy, right to immediate possession, status of rents, status of contract payments, balances due on contracts or any other expectation or assumption not specifically required as an essential element of the written offer;

> 3. The offer must be complete and in writing with no oral terms or considerations;

4. The offer must be accompanied by a five percent (5%) earnest money deposit paid to the Escrow account of the Myers Law Office (which will be applied against the purchase price at closing or refunded if the offer is not the best and, thus, not accepted).

5. The conforming written offer and earnest money must be received in this office no later than 4:30 pm on December 7, 2015.

*Id.* At the bottom of the second page, under Attorney Myers's signature, the letter stated: "P.S. This same letter will be sent to the other offering party and make [sic] known to others in the local community." *Id.* When asked about Objector's Exhibit 10, Fortunka testified that the real estate commission mentioned in the letter factored into her decision to make the offer for $225,000 and she thought the benefit of her offer would be "less charges to the Trust." Transcript Volume II at 75.

[11] Fortunka's response, addressed to Attorney Myers, dated December 7, 2015, and admitted as Objector's Exhibit 11, mentioned his November 24, 2015 letter, stated that "[f]or the second time we are communicating with [sic] you [n]ot to sell the 14 properties for $220,000," indicated that "running an unadvertised two party auction is not in the benefit" of the Estate or the beneficiaries, and advised that the properties should be marked individually utilizing real estate professionals. Exhibits Volume I at 114. When asked about Objector's Exhibit 11, Fortunka testified that she considered, at that time, her offer to take the property in lieu of cash to still be valid, that her letter did not contain the earnest money because she was "already basically as an heir own [sic] the property" and

she "didn't feel it was necessary to give money that they already had." Transcript Volume II at 78.

[12] A Purchase Agreement, also dated December 7, 2015, and admitted as Objector's Exhibit 13, indicates that AM Fire Properties, LLC ("AM Fire") agreed to purchase fourteen houses for $226,000. The Agreement contains, on the "Seller's Signature" line, the signature of "Teresa Morningstar trustee," provides that AM Fire would submit $12,000 as earnest money, and states in a typed paragraph under the heading "Further Conditions" that "Myer Law Office [is] to hold Earnest Money" until title is approved for each of the houses.[8] Exhibits Volume I at 121. After Objector's Exhibit 13 was admitted, Fortunka testified that she had a conversation with Morningstar on December 1st about the pending sale, in which she explained her thought that Morningstar was selling the properties too low and Morningstar said the properties were "in such disrepair that whoever brought these properties would have a lot of headaches and a lot of expense." Transcript Volume II at 82.

[13] Attorney Myers's response to Fortunka's December 7, 2015 letter, dated the following day and admitted as Objector's Exhibit 12, stated that Fortunka's correspondence "fell short of compliance with the bidding criteria established and therefore does not qualify for consideration" and that the other nineteen

[8] Objector's Exhibit 17 is a photocopy of a check in the amount of $12,000 from "AMFIRE PROPERTIES" and made out to "Myers Law Office/ Escrow Acct" for "earnest $ Morningstar Estate." Exhibits Volume I at 131. The date on the check is "12/7/12." *Id.*

heirs besides Fortunka and Foreman "have been silently waiting for the sale and to receive their proceeds from the trust," which was the reason that Attorney Myers was "convinced that [Fortunka's] opinion is not reflective of the best interests of the beneficiaries as a whole." Exhibits Volume I at 115. It further indicated that the properties

> are offered "As Is" because the cost of rehabilitating them to the local standards of marketability would be prohibitive. Almost every property sold in these zip codes is sold "As Is" which is ample evidence that your statements have no basis in reality for application to the south east side of Fort Wayne, IN.

*Id.*

[14] A letter by Attorney Myers addressed to the beneficiaries of the Trust, dated December 23, 2015, and admitted as Objector's Exhibit 14, indicated that "[t]he accounting I offered is in process" and "should be done by the end of January," that he had conducted record searches and responded to numerous inquiries, which he billed to the trust, due to "baseless accusations" by "a certain few of the beneficiaries . . . seeking to create anxiety in the remainder of the beneficiaries," and that he had

> a demand that the Trust have appraisals made. Had that been done, the cost would have been nearly $8,000.00 more of your money. [Morningstar] is unwilling to spend those funds when

our own market analysis tells us that the prices being received are competitive for this type of real estate and its location.[9]

*Id.* at 123-124. When asked about Objector's Exhibit 14, Fortunka testified that she did not believe that the letter informed the beneficiaries that there was already a pending transaction pursuant to the December 7, 2015 Purchase Agreement and that before the closing for the properties, which occurred on January 15, 2016, she did not know it was going to occur.

[15] The court admitted, as Objector's Exhibit 31, affidavits of the custodian of records at the Allen County Assessor's Office and certified sales disclosure forms for "the subject properties, fourteen [] in total which were sold at closing January 15, 2016,"[10] over Morningstar's objection regarding their reliability. Transcript Volume II at 131. With the exception of the form disclosing the sale of 5714 Holiday Lane by the Estate of Virgil C. Morningstar, the sales disclosure forms with a conveyance date of January 15, 2016 list the Trust as

---

[9] At the bottom, under the signature line, the letter states: "**AMOUNT SPENT ON BASELESS ALLEGATIONS**: (*Remember that this included dealing with a challenge to the sale of the 642 sq. ft. lake cottage for $300,000.00, suggesting that it was valued nearer $700,000.00*) From September 15, 2015 through December 15, 2015 the costs to you for the baseless claims which I have addressed now total: $2,693.50." Exhibits Volume I at 124.

[10] The Affidavits of the Records Custodian in Objector's Exhibit 31 affirm they are from the "custodian of the records at/for the Allen County Assessor's Office, including those related to the (  ) Property Record Card or (XXX) Sales Disclosure Form" for locations at "5226 Winters St," "2822 Mauldin Dr," "2724 Schaper Drive," "2315 St Marys," "2221 Vance Ave," "5714 Holiday Lane," "2602 Lynn Ave," "4115 Robinwood Dr," "4809 Spatz Ave," "4310 Standish Dr," "2620 Trentman Av," "436 Violet Ct," "3724 Winter St," and "1302 Sinclair St," as well as for a location at "6030 Kent Rd." Exhibits Volume I at 156, 161, 166, 171, 176, 181, 189, 192, 200, 205, 210, 215, 223, 228, and 233. Further, the affidavits affirm that the representations were "true this 13 day of July, 2018," and the Sales Disclosure Forms attached to each include a stamp, located at the top, which states "Jul 13 2018 [] Stacey O'Day Allen County Assessor." *See id.*

the Seller/Grantor and Kaufmann LLC as the Buyer/Grantee. Forms sharing that same conveyance date indicate varying sales prices, ranging from $8,000 to $37,000. The exhibit contains several sales disclosure forms for subsequent sales of the same properties that list AM Fire as the Seller/Grantor.

[16] During direct examination by Fortunka's counsel, Morningstar indicated that "Kaufmann, LLC" "somehow had an assignment under the purchase agreement with AM Fire" and "came to the closing and actually paid" $226,000 for the fourteen parcels. *Id.* at 133. Morningstar further testified that she had never been a realtor, was not trained as such, and did not have a real estate license. She answered, "No I do not," when asked if she knew how it "came to be that AM Fire made a second offer" for the properties, and she answered "No sir" when the court asked if she knew what happened between the initial offer of $220,000 and the offer of $226,000 that would explain the increase of $6,000. *Id.* at 158. When the court asked if the increase was "in anyway related to the fact" that "between those two [] contracts that this lady had made an offer to buy the properties," she answered "No sir. I mean I didn't do – I didn't contact anybody. It was just – it came in," and when asked if she knew whether or not Attorney Myers communicated to AM Fire that one of the beneficiaries had made an offer of $225,000, she answered that she did not know. *Id.* at 158-159. When asked if the only thing she did to charge the finder's fee was have a meeting with Fred Webb of AM Fire at some point in time, she answered "I found him, yes," and indicated she did not conduct any negotiation. *Id.* at 167. She testified that she did not inform the beneficiaries of her plans to charge the finder's fee at any time

or ask permission of the court to charge it. She indicated that she "did three percent (3%) which was half of a what a realtor would charge," in response to being asked how she determined the amount for the finder's fee. *Id.* at 169-170. The court sustained an objection based on the Dead Man's Statute when her counsel asked during cross-examination whether Virgil was aware that she had received a percentage of the sale proceeds of a lake cottage, and Morningstar answered affirmatively when asked if she sold "the other properties while Virgil was alive and retain[ed] a percentage fee for that activity," indicated she did not know how many times and stated"[a] few, yes," and answered "[y]es I did" when asked if she consulted Virgil when she did so.[11] *Id.* at 179. She answered in the negative when asked if she negotiated for a price with the buyer on any given property. During recross-examination, the court asked her if she expected it to believe that, when she signed her name on the disclosures and "they put a value on each of the properties," she did not realize what she was doing, Morningstar answered "[h]onestly, I just signed the papers," and when the court asked in follow-up "[a]nd you stick by that you didn't realize what you were doing," she responded "I stick by that. I really didn't realize what I was doing." *Id.* at 193.

[17]  Christopher Lasley, who worked for the Trust as a property manager until 2014, testified as to his recollections about three properties and answered questions about another property. When Morningstar moved to submit Trustee's Exhibit

---

[11] The court later sustained an objection based on the Dead Man's Statute when counsel asked whether, at any point in time, Virgil threatened to fire Morningstar from her job as Trustee. **(179)**

F, a list in which Lasley "put down what [he] fe[lt] was the value" for the fourteen Trust properties in question, Fortunka objected and Lasley indicated in response to preliminary questions that he was not a licensed realtor or appraiser of Indiana real estate, had not ever taken classes in real estate appraisal, did not conduct real estate appraisals for his current employer, and that he had not given an opinion as to residential real estate values before he was given the list by Attorney Myers. Transcript Volume III at 54. The court sustained the objection.

[18] Kyle Roemmich, a licensed realtor and owner of a property management company testified that potential rental property owners ask to "look at houses that they're thinking about buying and giv[e an] opinion on what it would cost to get it rent ready, make the repairs, things like that," and testified that he prepared upon request a list of valuations for certain properties. *Id.* at 62. When Morningstar moved to admit the list, Fortunka objected as to the competency of the witness. After Roemmich answered in the negative to each of the court's questions of whether he went into any of the properties, knew the status of the units' plumbing, heating, air conditioning, or electric, or used any comparables or Allen County or Township records in preparing the valuations, the court sustained the objection. *Id.* at 66.

[19] Fred Webb of AM Fire testified about purchasing the fourteen properties and, when asked about how he increased his offer to $226,000, stated "I got a call. I think it was that my offer wasn't good enough, wasn't high enough and that I needed it best and final." *Id.* at 97.

[20]     On November 21, 2018, the court issued its Findings of Fact, Conclusions of Law and Judgment on Trustee's First Accounting and the Objections Thereto. In its Findings of Fact the court found: from December 7, 2015, until the real estate closing on January 15, 2016, neither Attorney Myers nor Morningstar ever disclosed the acceptance and new purchase price sum of $226,000 from AM Fire to any of the Trust beneficiaries; Morningstar accepted AM Fire's offer to purchase the Trust real estate as evidenced by the December 7, 2015 purchase agreement; Webb heard from Morningstar "that his first offer to purchase of $220,000.00 wasn't good enough"; that the conflict in testimony between Webb and Morningstar concerning the request for new bids and the vague discussion about what "highest and best offer" meant is "very suspicious"; and that it concluded that either Morningstar or Attorney Myers must have communicated Fortunka's offer to Webb "prior to his alleged submission of his second 'best and highest offer.'"  Appellant's Appendix Volume II at 20.  The court found: that the check purporting to be AM Fire's earnest money deposit, which was dated three years prior to the time in question, was not credibly the earnest money deposit made by AM Fire; that none of the evidence presented was consistent with AM Fire submitting an earnest money deposit on December 7, 2015; and that AM Fire did not meet Morningstar's bidding criteria.  It further found: Morningstar did not order the Trust real estate appraised "so the values of the parcels at the time of sale or at the time of Virgil's death were not established"; that by using the values of the Trust real estate "as determined by the Allen County Sales Disclosure forms," twelve of the properties "were sold by [Morningstar] for a price less than the

appraised values or subsequent sales price"; that based on the appraisals and subsequent sales disclosure information, the purchase price of $226,000 "in the aggregate is $128,100 less" than the fair market value of the Trust real estate, and that Morningstar's "unilateral action" deprived the Trust of that amount. *Id.* at 25-26.

[21] With regard to the three percent "finder's fee" of $6,780, the court found:

> 18. The Trustee's witness, Cindy Wirtner, C.P.A. testified that a finder's fee is paid to someone as a fee for finding a buyer or a seller in a transaction. [Morningstar] did not find the buyer of the 13 properties; and was being compensated as Trustee on a bi-monthly basis when she received a $6,780 "finder's fee".
>
> 19. Ms. Wirtner also testified that the 3% "finder's fee" paid to [Morningstar] was not a "finder's fee", but was a commission. Although Virgil's lake property was not in the trust when it was sold, the 4% "finder's fee" was in fact a $12,000 commission. The "finder's fee" paid to the Trustee on sales of 20-25 parcels of real estate sold before the trust was funded were also commissions.
>
> 20. That the Trustee's attorney approved the $6,780 "finder's fee" does not render said payment as a commission to be proper or legal.
>
> * * * * *
>
> 22. The Trustee's first accounting disclosed that on January 26, 2016, she received a distribution of Trust property in cash in the sum of $8,000. She had also received a $26,000 distribution of cash from the Trust on December 18, 2015.
>
> 23. In addition to the Trustee's receipt of her beneficiary distributions of $8,000 and $26,000 . . . she also received the finder's fee of $6,780 from the sale of the Trust Real Estate. She

had previously received a four percent (4%) finder's fee from the Estate of Virgil Morningstar for the sale of the lake property in Michigan for the sum of $300,000, which reduced the funds to be distributed to the Trust. The Trustee also collected reimbursement for mileage, cell phone and bi-monthly payroll payments of $849.50 while the Trust Real Estate property was under management by the Trust.

*Id.* at 28-29 (internal citations omitted).

[22] In its Conclusions of Law, the court concluded that: "[b]ased upon review of the exhibits in this case in assessing the demeanor and consistency of her testimony, [Fortunka] was a credible witness at the hearings"; "[b]ased upon the exhibits, testimony of other witnesses, including [Webb] and [Fortunka], [Morningstar] was not a credible witness concerning her communications with [Webb] relating to the Trust Real Estate transaction and events leading up to the closing in January 2016, as well as in other parts of her testimony, including at the signing of sales disclosure documents she claimed 'she didn't realize what she was doing'"; and that Morningstar's history of collecting finder's fees from prior real estate properties, although not part of the issues before the court, demonstrate a past practice of unsupervised collection of finder's fees without court approval or disclosure to Trust beneficiaries. *Id.* at 29. It further concluded that Morningstar breached her duty to preserve Trust property by failing to adequately determine the value of Trust Real Estate through appraisals and selling it against the objections of multiple beneficiaries at less than fair market value and at a loss of at least $128,100; she breached her duty "against self-dealing pursuant to I.C. § 30-4-3-5" by paying herself a finder's fee without consultation or consent from

the beneficiaries or the court despite her failure to demonstrate any actions on her part to cultivate a buyer, to maximize the sales price, or to close the sale of the property, resulting in a loss of $6,780; and she breached her duty of loyalty to the beneficiaries by requiring "Fortunka to strictly adhere to certain bidding criteria, such as submission of an earnest money deposit, while at the same time granting the third party special treatment by allowing the third party to forego submitting an earnest money deposit with its bid." *Id.* at 32-33. It ordered Morningstar liable to the beneficiaries in the amount of $128,000 and to disgorge the $6,780 she received as finder's fees, that the total judgment of $134,880 "shall be a charge against [her] beneficial interest in the Trust," and that the "Trustee is liable to [Fortunka] for reasonable costs and attorney's fees," who along with her counsel was "authorized to submit their petition for fees within fourteen (14) days of this Order. The Court will then determine an Order for Reimbursement." *Id.* at 33-34.

[23] On November 30, 2018, Morningstar submitted her Resignation of Trustee letter which provided that it would "be effective at 11:59 pm on December 31, 2018." Motion to Dismiss Exhibit A at 1. The chronological case summary contains an entry indicating that Fortunka filed a petition for attorney fees and costs on November 30, 2018, and the court conducted a hearing at which it considered the petition and arguments of counsel and ultimately awarded a judgment against Morningstar and in favor of Fortunka in the amount of $94,472.00.

Fortunka later filed a request for judicial relief to appoint successor trustee, and the court held a hearing and appointed STAR Bank, which filed an unopposed motion to add it as an appellee with this Court, which we granted.

## *Discussion*

The issue is whether the trial court erred in finding that Morningstar breached her duties as trustee. When the trial court enters an order containing findings of fact and conclusions, we apply a two-step review. *In re Wilson*, 930 N.E.2d 646, 650 (Ind. Ct. App. 2010), *trans. denied*. First, we consider whether the evidence supports the findings, and second, whether the conclusions support the judgment. *See id.* We will neither reweigh the evidence nor assess witness credibility, considering only the evidence most favorable to the judgment. *Id.* We will set aside the trial court's findings and conclusions only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. *Id.* We apply a *de novo* standard of review to conclusions of law. *Id.*

A trust is "a fiduciary relationship between a person who, as trustee, holds title to property and another person for whom, as beneficiary, the title is held." Ind. Code § 30-4-1-1(a). "A 'breach of trust' is a violation by the trustee of any duty that is owed to the beneficiary, with the duties being established by statute and by the terms of the trust." *In re Stuart Cochran Irrevocable Trust*, 901 N.E.2d 1128, 1138 (Ind. Ct. App. 2009), *trans. denied*. *See* Ind. Code § 30-4-1-2(4)

(2014) (defining "breach of trust").[12] A trustee has duties to administer a trust according to the terms of the trust and to preserve the trust property. *See* Ind. Code § 30-4-3-6(a) and (b)(3) (2015).[13]

A. *Breach of Duty Relating to Sales of Trust Property*

Morningstar first argues the trial court erroneously valued the Trust assets and asserts that the methodology it used to arrive at the fair market value was illogical, incorrect, and unsupported by the evidence. She contends that the court erroneously used the sale price for each property shown on its Sales Disclosures from the Trust to Kaufmann, LLC – which she characterizes as a "random assignment of individual values" – in light of her testimony that she did not have input on the values placed on the disclosures. Appellant's Brief at 20. She asserts that the court then erred in comparing those values to either the appraisal value – in light of Roemmich's testimony – or the price on the Sales Disclosure in the later fourth party sale by AM Fire, which she asserts failed to account for the renovations made by AM Fire. She argues that, instead of considering them individually, the properties should be considered in sum, as a whole portfolio; that Fortunka placed a total value upon the properties of $225,000, as indicated by her offer; and that Fortunka never proved any other overall value than that evidenced by the sale for $226,000 between a willing seller and a willing buyer.

---

[12] Subsequently amended by Pub. L. No. 163-2018, § 13 (eff. July 1, 2018); Pub. L. No. 33-2019, § 13 (eff. July 1, 2019); Pub. L. No. 221-2019, § 1 (eff. July 1, 2019); and Pub. L. No. 231-2019, § 21 (eff. July 1, 2019).

[13] Subsequently amended by Pub. L. No. 221-2019, § 3 (eff. July 1, 2019); Pub. L. No. 231-2019, § 24 (eff. July 1, 2019).

She contends that her previous experience of selling other properties under Virgil's watch made her "very familiar with the marketability of low income properties" and formed the basis for her acceptance of AM Fire's offer of $226,000. *Id.* at 18. She further argues that "Fortunka's bid failed to include the requirements of a legitimate offer," and that, because Fortunka's bid amount was exceeded by that of another buyer, she was thus duty-bound to sell the properties for the higher offer. *Id.* at 13.

[28] STAR Bank argues Morningstar's specific objections on appeal as to valuation of the properties amounts to a re-litigation of disputed facts and that the court's findings must be viewed through the lens of its credibility determinations which, as evidenced by the judgment and order, weighed heavily in Fortunka's favor and against Morningstar. It argues that the process of selling the properties was unusual and highly suspect and that the bid process "appeared to be rigged." Appellee STAR Bank's Brief at 16. Fortunka contends that the whole issue in this case could have been avoided if appraisals of the property had been done "as is routine and customary in trust administration before the sale of real estate so that the beneficiaries are protected." Appellee Fortunka's Brief at 22.

[29] With regards to the valuation of the Trust property, the record as set out above reveals that Objector's Exhibit 31 contained sales disclosure documents displaying sales prices for the Trust properties for conveyances on January 15, 2016, and on subsequent dates, which were attached to affidavits of the custodian of the records for the Allen County Assessor. The court heard

testimony about the properties, the differences between each, and estimates of prices for the separate properties and in the aggregate from several witnesses, including that of Mack, who was qualified without objection as an expert in the field of appraisals. It also heard and was able to consider and weigh the testimony of other witnesses regarding the properties' values. We do not reweigh the evidence nor assess witness credibility. *See In re Wilson*, 930 N.E.2d at 650. Having found that the record contains facts and inferences supporting the court's valuation, we do not disturb its finding that the purchase price in the aggregate of $226,000 was less than the fair market value of the Trust real estate, which it valued at an amount of $128,100 in excess of $226,000.

[30] We further note the extensive findings in the court's twenty-three page order regarding the administration of the Trust, especially the findings that Morningstar did not order an appraisal as the Trustee, despite not knowing the worth of the Trust's real estate assets, and that Fortunka was a credible witness, whereas Morningstar was not. With that in mind, we observe that the Trust first divulged to the beneficiaries the addresses of the properties on October 30, 2015, in the same letter that it shared that it had secured a potential willing purchaser. In the same letter, the Trust outlined that, alternatively, Morningstar could "continue to market each unit seeking a cash buyer" or one or more of the beneficiaries could "come up with the money to buy them or agree to take them as a distribution." Exhibits Volume I at 105-106. Fortunka presented evidence that she expressed to the Trust a desire as a beneficiary to explore either option. When the Trust disclosed the amount of the initial offer, Fortunka expressed her

disagreement in selling Trust assets at a price she considered "far below fair market value." *Id.* at 111. We cannot say that the trial court's conclusion that Morningstar breached her duty to preserve Trust property was clearly erroneous.

## B. *Breach of Duty Relating to Finder's Fees*

[31] Morningstar argues that her receipt of a finder's fee is not prohibited self-dealing under Ind. Code § 30-4-3-7.[14] She argues that she presented evidence of a practice in which Virgil, prior to his death, paid her compensation for locating qualified buyers of his own real estate, and that of the Trust. She further contends her efforts saved the Trust from incurring costs that would have been incurred "[h]ad the . . . Trust properties been sold using a Realtor" and that, for these savings, she was paid the finder's fee of $6,780. Appellant's Brief at 34.

[32] Fortunka responds that Morningstar presented no independent evidence of Virgil's alleged approval of past finder's fees and contends that she did not object when the court struck the self-serving testimony in accordance with the Dead Man's Statute per Ind. Code §§ 35-45-2.[15] STAR Bank contends it is

---

[14] Titled "Self dealing; transactions between trusts," Ind. Code § 30-4-3-7 provided in part at the time of the Trust Administration that, unless the terms of the trust provide otherwise, the trustee has a duty "not to loan funds to the trustee or an affiliate," "not to purchase or participate in the purchase of trust property from the trust for the trustee's own or an affiliate's account," and "not to sell or participate in the sale of the trustee's own or an affiliate's property to the trust." (Subsequently amended by Pub. L. No. 194-2017, § 9 (eff. July 1, 2017)). To the extent that the trial court referenced "self-dealing" in its conclusions of law section, we cannot say reversal is warranted on this basis in light of its citation to and discussion of the statutory elements of Ind. Code § 30-4-3-5 and application to the facts of this case. *See* Appellant's Appendix Volume II at 30-32.

[15] In *Childress Cattle, LLC v. Estate of Cain*, this Court stated that the Dead Man's Statute

undisputed that she engaged in "little to no effort in 'finding' the buyer; in fact, the buyer may well have found her" and that she was paying herself a substantial salary out of the Trust during the relevant time frame. Appellee STAR Bank's Brief at 13.

[33] As noted, a trust is a fiduciary relationship, *see* Ind. Code § 30-4-1-1(a), and a trustee has duties to administer a trust according to the terms of the trust and to preserve trust property. *See* Ind. Code § 30-4-3-6(a) and (b)(3) (2015). *See also N.L.R.B. v. Amax Coal Co., a Div. of Amax, Inc.*, 453 U.S. 322, 329-330, 101 S. Ct. 2789, 2794 (U.S. 1981) ("Under principles of equity, a trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties. To deter the trustee from all temptation and to prevent any possible injury to the beneficiary, the rule against a trustee dividing his loyalties must be enforced with 'uncompromising rigidity.'

---

establishes as a matter of legislative policy that claimants to the estate of a deceased person should not be permitted to present a court with their version of their dealings with the decedent. *In re Estate of Rickert*, 934 N.E.2d 726, 731 (Ind. 2010). Our Court has explained that

> Generally, when an executor or administrator of an estate is one party, the adverse parties are not competent to testify about transactions that took place during the lifetime of the decedent. Furthermore, the general purpose of the statutes is to protect decedents' estates from spurious claims. The Dead Man's Statutes guard against false testimony by a survivor by establishing a rule of mutuality, wherein the lips of the surviving party are closed by law when the lips of the other party are closed by death.

> We have held that the Dead Man's Statutes apply to all cases in which a judgment may result for or against the estate, notwithstanding the parties' positions as plaintiff or defendant. In addition, neither the express language of the statutes nor accepted concepts of fairness should preclude application of the statutes so long as no statements made by the decedent are admitted through depositions or public records made during his life.

*J.M. Corp. v. Roberson*, 749 N.E.2d 567, 571 (Ind. Ct. App. 2001) (internal citations omitted). 88 N.E.3d 1121, 1123 (Ind. Ct. App. 2017).

A fiduciary cannot contend 'that, although he had conflicting interests, he served his masters equally well or that his primary loyalty was not weakened by the pull of his secondary one.'" (internal citations omitted)), *reh'g denied*; *Scanlan v. Eisenberg*, 669 F.3d 838, 844 (7th Cir. 2012) ("A trustee owes a fiduciary duty to a trust's beneficiaries and is obligated to carry out the trust according to its terms and to act with the highest degree of fidelity and utmost good faith. The fiduciary obligation of loyalty flows from the relationship of the trustee and beneficiary . . . ." (internal citations omitted)).[16]

[34]    Ind. Code § 30-4-3-5 provides:

> If the duty of the trustee in the exercise of any power conflicts with the trustee's individual interest or the trustee's interest as trustee of another trust, the power may be exercised only under one (1) of the following circumstances:
>
> > (1) The trustee receives court authorization to exercise the power with notice to interested persons as the court may direct.
> >
> > (2) The trustee gives notice of the proposed action in accordance with IC 30-2-14-16 and:

---

[16] We also note that the Indiana Law Encyclopedia provides that, "[b]ecause a trustee's fundamental duty of complete loyalty to the interests of a beneficiary requires him or her to forego all selfish interests in the administration of the trust, a trustee may not profit therefrom." 28 Ind. Law Encyc. Trusts § 109. We further note that comment c(2) of § 86 of the Third Restatement of Trusts notes that although a trustee ordinarily "has broad authority with regard to the sale of real property held in the trust, and even if confirmed by powers expressly granted in a statute or trust provision, the exercise of the trustee's power of sale requires the exercise of prudence . . . , as well as compliance with other relevant fiduciary duties . . . . In this context, the demands of fiduciary care and skill . . . are likely to be particularly rigorous – requiring the exercise of due diligence and competence, via advisors or agents if and as needed by the trustee – because of the pricing, information, and other challenges presented by the particular market."

(A) the trustee receives the written authorization of all interested persons to the proposed action within the period specified in the notice of the proposed action; or

(B) a beneficiary objects to the proposed action within the period specified in the notice of the proposed action, but the trustee receives court authorization to exercise the power.

(3) The exercise of the power is specifically authorized by the terms of the trust.

[35] Article X of the Trust is titled "Compensation of Trustee" and provides in part that the trustee shall receive reasonable compensation "for unusual and extraordinary services" rendered in settling the trustors' financial affairs and in making distribution of the assets. Appellant's Appendix Volume II at 41. Article X further provides that "[s]uch compensation shall be adequate to cover the work involved, as well as responsibilities assumed, in effecting financial disposition of the trust." *Id.*

[36] The record reveals Morningstar paid herself $6,780 in connection with the sale of the Trust properties, and that she received monthly or bimonthly payroll disbursements at the time of $845.50. At the hearing, she answered "I found him, yes," when asked if the only thing she did to charge the finder's fee was have a meeting with Webb at some point in time, and she indicated she did not conduct any negotiation. Transcript Volume II at 167. Under the circumstances, we find that the court's determination that $6,780 was not reasonable compensation paid for "unusual and extraordinary services" was not

clearly erroneous. Based upon the evidence and testimony presented, we conclude that Morningstar committed a breach of trust under Ind. Code § 30-4-3-5 and affirm the judgment ordering her to disgorge the $6,780 payment.

[37] For the foregoing reasons, we affirm the trial court's order.[17]

[38] Affirmed.

May, J., and Mathis, J., concur.

---

[17] While both vigorous representation of a client and thorough and responsive communication are desirable, we caution Attorney Myers to review the expectations set forth in the Ind. Rules of Professional Conduct, in light of the correspondence he shared with the beneficiaries as the representative of a fiduciary, as detailed above and which did not disclose AM Fire's second offer to purchase.